IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

UNITED STATES OF AMERICA, * No. DR-09-CR-1278
*
Plaintiff, *
*
v. * OCTOBER 18, 2022
*
JOSE INEZ GARCIA-ZARATE, a/k/a, *
*
JUAN JOSE DOMINGUEZ-DE LA PARRA, *
*
Defendant. * DEL RIO, TEXAS

---

TRANSCRIPT OF FINAL REVOCATION HEARING

BEFORE THE HONORABLE ALIA MOSES

UNITED STATES DISTRICT JUDGE

---

**A P P E A R A N C E S**

For the Government: UNITED STATES ATTORNEY'S OFFICE
BY: IZAAK BRUCE
Assistant U.S. Attorney
111 E. Broadway, Suite 300
Del Rio, Texas 78840

For the Defense: LAW OFFICES OF GREGORY D. TORRES
BY: MR. GREGORY TORRES
457 Jefferson Street
Eagle Pass, Texas 78852

U.S. Court Interpreter: MR. ENRIQUE NORIEGA

Proceedings recorded by mechanical stenography. Transcript produced by Computer-Aided transcription.

(9:49:42 A.M., START TIME)

THE COURT: All right. Okay. We are back on the record in DR-09-CR-1278, the United States of America versus Jose Inez Garcia-Zarate.

AUSA BRUCE: Izaak Bruce for the United States.

MR. TORRES: Gregory Torres for the defendant, Jose Inez Garcia-Zarate, Your Honor.

THE COURT: And this is an uncontested revocation hearing on a second amended petition dated July 27th of 2022. Everybody have that one?

MR. TORRES: Yes, ma'am.

AUSA BRUCE: Yes, Your Honor.

THE COURT: All right. Mr. Bruce, does the government wish to make an opening statement?

AUSA BRUCE: The government waives, Your Honor.

THE COURT: Mr. Torres?

MR. TORRES: Same announcement, Your Honor.

THE COURT: Your evidence, Mr. Bruce?

AUSA BRUCE: Your Honor, the government proffers the second amended petition.

THE COURT: Any objections, Mr. Torres?

MR. TORRES: None, Your Honor.

THE COURT: So admitted. Any other evidence, Mr. Bruce?

AUSA BRUCE: No, Your Honor.

THE COURT: Mr. Torres, any evidence?

MR. TORRES: None, Your Honor.

THE COURT: Okay. Mr. Bruce, closing arguments.

AUSA BRUCE: The government waives, Your Honor.

THE COURT: Mr. Torres?

MR. TORRES: Same announcement, Your Honor.

THE COURT: Then I will deny the government rebuttal, and the Court will make the following findings by a preponderance of the evidence.

That the defendant, who appeared in this court under the name of Juan Jose Dominguez-De La Parra, also known as Juan Francisco Lopez-Sanchez, with a true name of Jose Inez Garcia-Zarate, was originally sentenced in this court May 12th of 2011. He received a 46-month term of incarceration. And the Court at that time had received a transfer of jurisdiction from a New Mexico case, and that was -- there was a revocation on that day as well, for which he received 21 months. And that was in DR-10-CR-1352. All -- the 67 -- 67 months of incarceration to be followed by a three-year term of supervised release. That term of supervision began March 26th of 2015. So therein began some of the problems.

Let me go through the allegations, and then I'm going to get some dates and matters on the record. That the defendant violated the following conditions of his term of supervised release. And for the first -- for the six

paragraphs, the violation would be of the same two conditions.

Mandatory Condition Number One, the defendant shall not commit another federal, state, or local crime during the term of supervision.

Mandatory Condition Number Four, if convicted of a felony, the defendant shall not possess a firearm, ammunition, destructive device, or other dangerous weapon. That on March 26th of 2015, the defendant was released from custody of BOP to the custody of ICE. That on that same day, he was transferred to the custody of the San Francisco County Sheriff's Department for a pending charge of transport, back slash, sale of a controlled substance, which the original date of that offense was October 26th of 1995.

That on the next day, March 27th of 2015, the case -- the state case was dismissed. That in the in-between time, the time from March 27th of 2015 to the date he was released by San Francisco into the community, being April 15th of 2015, the defendant was in the custody of the San Francisco County Sheriff's Department. This Court can't seem to fathom why since that case was already dismissed and there was nothing pending for him in state court. So he was in -- he was kept in custody three weeks longer than he should have.

However, during that time period, ICE had been calling the Sheriff's Department to take custody of the defendant again so that a deportation proceeding could occur,

and the Sheriff's Office refused to honor that -- that detainer, and instead released Mr. Garcia-Zarate into the community. And the sheriff flat out refused to honor the detainer, which at that time was written as a command or an order to turn the -- the person, or the body, over to ICE. After that, the President ordered ICE to change the wording of the detainer to be a request because of Mr. Garcia-Zarate. It's now just a request, not an order or a command.

That according to the automated criminal history report and contact with the San Francisco Police Department, the defendant was arrested on July the 2nd of 2015 again, after -- after released into the community by the Sheriff of San Francisco. And that was because on the previous day, July the 1st of 2015, the defendant shot and killed a 32-year-old female with a firearm; that the defendant murdered the young lady -- or at the minimum was involuntary manslaughter. That he was in possession of a firearm that the defendant, I think at the time, claimed to have found wrapped in either paper or cloth under a bench at the San Francisco pier.

So he was -- he was a felon in possession of a firearm, and he was also an alien in possession of a firearm, and he assaulted the young woman with the firearm, the young woman being Kate Steinle. Thereafter, he was taken into custody by the federal government and convicted of the offense of being an alien in possession of a firearm and ammunition.

At some point, all of the state cases were either of -- by beyond a reasonable doubt, he either got acquitted or were overturned on appeal, but the federal case remained the alien in possession of a firearm or ammunition, for which he ended up absorbing all of the time that he had spent in custody since July the 1st of 2015. Thereafter, the defendant was returned to the Del Rio Division on the warrant that has been pending in this case since July 14th of 2015.

Now, at the time that the defendant was sentenced by this Court in 2011, we were just on the cusp of, I think, the -- the rulings on whether or not a drug -- a state drug delivery transportation case had to have remuneration as an element. We weren't quite there yet. But this defendant had started out in 1991 with a possession of a vapor-releasing substance containing a toxic substance, a Class Five undesignated offense, out of Phoenix, Arizona. He received an 18-month term of probation with 30 days of confinement. That probation was revoked and he received a 93-day term of incarceration. That one did not count in the criminal history score back in 2011.

In 1992 he picked up a criminal trespass case for which he received a 90-day sentence. It did not count. That was in Tacoma, Washington. In 1993 he picked up an unlawful possession of a controlled substance, cocaine. And that was actually a -- a trafficking case of which was downgraded to a possession matter, for which the defendant received 21 days of

imprisonment and a 12-month term of probation. And that was then modified and terminated for which he again received zero points under his criminal history category.

Then he -- in 1993 again, he received conspiracy to deliver a controlled substance. He received a nine-month term of incarceration plus 12 months of probation. The sentence was then modified and he received a 25-day term of imprisonment, and then he -- again it was modified and he had 52 more days of imprisonment. And that was also not scored under the guidelines at the time. That was, again, a -- the officers had observed a transaction for a narcotics sale. That became a conspiracy count.

He got a third such case in Tacoma in 1993. It was unlawful possession of a controlled substance. Cocaine. It was, again, an observed controlled substance sale between two individuals, but the defendant ended up with a possession case. It also did not count for criminal history points because he received a four-month term of incarceration plus a 12-month term of probe -- excuse me, four months of incarceration with a 12-month term of probation. Then that sentence was modified to 25 days to run concurrently with another sentence. And then it was modified again and he received 47 days.

He received a resisting arrest in 1993 in Tacoma, Washington, for which he received a 90-day term of incarceration. It also didn't count for the criminal history

score.

In '94 he end up with a loitering for drug activity out of Tacoma. He received 365 days' imprisonment, but it did not count for the criminal history score.

In '94 he received delivery of an imitation controlled substance, a Class A misdemeanor, in Portland, Oregon. He received 18 months of probation. It did not get counted as a criminal history score.

In '96 he received an unlawful possession of a controlled substance, felony, that being heroin. The defendant received a sentence of 12 months and one day imprisonment out of Tacoma. That one also did not count for criminal history points.

In '98 he got a possession of marijuana in El Paso, Texas. He received seven days of imprisonment. It also did not count.

In 1998, he received a reentry after deportation out of New Mexico. That one did count for criminal history points. It received three points. He was sentenced to a 63-month term of incarceration, followed by a three-year term of supervised release. In '04 that term of supervised release was revoked and the defendant received a 21-month term of incarceration.

In '03, he received a second illegal reentry in Las Cruces. He received -- and that one, again, did count for three criminal history points. He received a 51-month term of

incarceration, followed by a two-year term of supervised release. That term of supervision began June 29th of '09, and it was due to expire when he ended up in the Del Rio Division. And that was transferred. And that was the case that was the basis for the 21-month term -- term -- 21-month term of incarceration in DR-10-CR-1352.

I'm not -- at the time he had the pending case out of California, the October 26, 1995 case, that was dismissed one day after he was in San Francisco custody. So the only thing that the Court can conclude about that is San Francisco --

Let's see, Mr. Ryan, he was released from Victorville -- is that correct -- in California?

PROBATION: I just have that they transferred him.

THE COURT: I want to say he was in Victorville, which is about 400 miles from San Francisco. So the only thing I can conclude is San Francisco pointedly wanted to get -- get Mr. Garcia in their custody since at that time they were a sanctuary city and county, and they had every intent of complying with that sanctuary rule. There wasn't any other reason to take him for a one-day term of incarceration and travel 400 miles one way to go pick him up.

I'm not going to go through the unadjudicase -- unadjudicated cases because he's still presumed innocent on those.

The defendant, at the time that the Court sentenced

him, still had his parents in Mexico and some siblings. That may have changed over the last number of years.

He was sent for a psychological evaluation out of Las Cruces, as well as this Court. And that's all reflected in the presentence report as well, in terms of the different information that he was giving. One time he was born in Leon, Guanajuato, other time he was born in Guadala -- Guadalajara, Jalisco. And so it kind of goes back and forth in terms of the information.

He lived all in the California/Portland/Tucson, Arizona area for the majority of the time he was in the United States.

Now, the defendant was found -- in the Court's last evaluation -- this Court's evaluation, the defendant was found to be suffering from some mental issues. However, he was doing very well. He was progressing well; he was taking his medication. He had some inappropriate behavior of a sexual nature. And he would also make claims that he was suicidal, and every time that they would then take measures because he was -- claimed he was suicidal, he would tell the doctors he was just -- he really wasn't suicidal, he was just making it up because he didn't like the housing, or he wasn't eating because he didn't like the food. He always would say he didn't like his cellmate or he was scared of his cellmate, so he would make outcries so he could be moved. And he would say he did not have

any intention of hurting himself.

They -- at one point, I think he -- he was trying to -- let me find it in the report. There was an indication that -- that he was suicidal, that he attempted to kill himself by hanging himself with a sheet. And he was -- and that was at a previous psych evaluation in Minnesota. When he -- when the doctors asked him about it in the psych evaluation in my case, he replied that he'd just been playing with the officers, he wanted to scare them, he wanted to annoy the correctional officers because they were refusing to provide him hygiene items or cigarettes.

And so every time he's attempted to do something, to set fire to his cell or doing any of these situations, he later comes back and says he was doing it for a particular reason. But as long as he was on his psychotropic medication, he was doing well, with the exception of trying to grab women and engage in inappropriate sexual conduct.

I will note that in this Court's sentence of 67 months, he actually served 66 and a half months of his sentence, which tells me he lost a whole lot of good-time credit. He would have qualified for a lot of good-time credit and he lost it.

The defendant was -- had -- he reported to probation that he had begun using marijuana at the age -- at a very early age -- at 15, I think -- and then moved on to cocaine, and that

he was a heavy tobacco smoker.

He didn't have much formal education and he was -- when he worked, he was basically -- he worked construction, as a roofer, he was a handyman, things of that nature.

I want to get to the -- I think he was deported -- Mr. Kirk, remind me how many times he was deported. Four or five times?

PROBATION: Let me count, Your Honor.

(BRIEF PAUSE)

PROBATION: He was at least deported May 6, 2003, after his first reentry after deportation condition -- conviction. He was also removed February 2nd, 1998. It appears that was his first. And then he was removed on June 29th, 2009, after his second reentry conviction in New Mexico. But then he was -- as the Court noted, he was not removed after --

THE COURT: After our case, right. Uh-huh. So he had three previous either removal/deportations, formal removal of deportations. So that tells the Court, which I see every day in my courtroom, just because they're deported or removed doesn't mean they're going to stay out. And for every time that a Court hear, Don't give them a lot of time because he's going to be deported, that doesn't quite mean anything to some folks.

The sad part is, this Court then received a call one day that Mr. Garcia-Zarate had gone out and shot a young woman. And that's what the Court finds in this matter.

So the Court therefore finds that the defendant has violated the terms and conditions of his supervised release as alleged in his petition. Accordingly, the Court finds that pursuant to the policy statements issued by the United States Sentencing Commission for the violation of probation and supervised release, the Court finds that there is a most serious grade of violation, Class A, Criminal History Category of Four; there's a range of imprisonment of 24 months. That being the statutory maximum, there would be no further term of supervised release. That the maximum term of imprisonment that may be imposed upon the revocation of the term of supervised release for the offense of conviction, a Class C felony, is two years.

At this time, Mr. Garcia, you have the opportunity to say whatever you'd like. Is there anything you'd like to say?

DEFENDANT GARCIA-ZARATE (By Interp): No.

THE COURT: He said "no," right?

MR. TORRES: That's correct, Your Honor.

THE COURT: Mr. Bruce?

AUSA BRUCE: Your Honor, as the Court summarized, the defendant has a long history of breaking the law, both in terms of dealing drugs and returning to the United States illegally. On this occasion, while he was in the United States, he possessed a loaded firearm in violation of conditions of supervised release because he was a felon, but also because he

was an illegal alien, and that resulted in the death of a young woman. He violated his supervised release in the most serious possible way, and the government moves for the maximum sentence.

THE COURT: Mr. Torres?

MR. TORRES: Your Honor, I -- I'll do it backwards, I guess. We're asking for a recommendation as close to Las Vegas, Nevada. My understanding --

THE COURT: I don't think so, Mr. Torres. I'm not going anywhere in the Ninth Circuit where they potentially have sanctuary cities. Don't even ask that. He's the reason I don't do those recommendations.

MR. TORRES: Very good, Your Honor. I -- I was instructed to ask.

THE COURT: I -- I -- and you've asked. It's on the record, and I'm going to deny that request. Mr. Zarate, the reason he's sitting here with a murder allegation in his petition is because of a sanctuary city called San Francisco. And a county. No. I'm not doing that again. I will not do that again. This man is going to have to not get the benefit of any sanctuary laws anymore because we know that whether he's shooting at a bird or he's shooting at a pier, he's a dangerous person to be walking around in our community.

So, no, I won't recommend any sanctuary city or sanctuary area in the -- anything in the Ninth Circuit.

MR. TORRES: Very good, Your Honor. Then, Your Honor,

I have no further allocution.

THE COURT: Okay. Mr. Torres, let me just ask you, though, out of an abundance of caution --

MR. TORRES: Yes.

THE COURT: -- you've been able to communicate well with your client?

MR. TORRES: I have, Your Honor. And -- and -- to -- I guess -- the Court's -- in other words, I believe it's -- it's my layman's opinion that he is competent. He's been able to answer all my questions, he's been able to interact in a normal and a rational way. It's my understanding that -- I believe that he understands the -- the consequences of his -- of this proceeding today.

THE COURT: And do you know if he's taking his medications?

MR. TORRES: That I do not know, Your Honor.

THE COURT: But he obviously must be if he's able to communicate and understand the proceedings and what you have to tell him.

MR. TORRES: He's been able to communicate and understand to the best of my knowledge every time I've see him, and I've seen him several times since he's come back.

THE COURT: Okay. So, Mr. Garcia, I'm going to give you the opportunity to say whatever you'd like. And I -- I would like to engage in a short conversation so that I'm -- I

feel comfortable that you've understood everything.

Mr. Garcia, did you -- are you receiving your medication at the jail?

DEFENDANT GARCIA-ZARATE (By Interp): Yes.

THE COURT: And you're able to take it.

DEFENDANT GARCIA-ZARATE (By Interp): They are not giving me the pills anymore.

THE COURT: Okay. Do you remember the last time you took the pills?

DEFENDANT GARCIA-ZARATE (By Interp): Yes, I do remember.

THE COURT: When would that have been, Mr. Garcia?

DEFENDANT GARCIA-ZARATE (By Interp): About three weeks ago.

THE COURT: Okay. And so have you seen a doctor, a psychiatrist, or spoken to one since then?

DEFENDANT GARCIA-ZARATE (By Interp): No. Not yet.

THE COURT: Okay. Then I'm going to ask the marshals to make sure that you do see someone just in case you should be on medication. Is -- is that fine with you?

DEFENDANT GARCIA-ZARATE (By Interp): That's fine.

THE COURT: Okay. So this interaction with the -- the defendant, the Court feels comfortable that he is understanding, that he does have a good ability to interact with the Court and understand what's happening in this matter.

Anything else by the parties after the Court's questions of Mr. Garcia, Mr. Torres?

MR. TORRES: Not from the defendant, Your Honor.

AUSA BRUCE: No, Your Honor.

THE COURT: Okay.

(BRIEF PAUSE FOR ATTORNEY/CLIENT CONFERENCE)

THE COURT: Okay?

MR. TORRES: We're done, Your Honor.

THE COURT: All right. It is ordered that the term of supervised release ordered by this Court on May 12th of 2011, and set forth in the judgment entered on May 12th of 2011, being the same, is hereby revoked and set aside.

The Court has considered the policy statements contained within Chapter Seven of the Sentencing Guidelines Manual and finds their application to be adequate.

Pursuant to the Sentencing Reform Act of 1984, it is the order of the Court that the defendant, Juan Jose Dominguez-De La Parra; also known as Juan Francisco Lopez-Sanchez; true name, Jose Inez Garcia-Zarate.

And I should say for the record, I think he had about 27 aliases of all varieties. I take it back, 32 aliases with one, two, three, four, five, six, seven, eight -- ten different dates of birth.

Be -- is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 24 months, to

be served consecutively to the sentence imposed in 3-17-CR-609-VC-1. That's the California federal case.

Mr. Garcia-Zarate, you have the right to appeal the Court's findings that you violated the terms and conditions of your supervised release as well as your sentence.

Anything further, Mr. Bruce?

AUSA BRUCE: No, Your Honor.

THE COURT: Mr. Torres?

MR. TORRES: No, ma'am.

THE COURT: Any other alternative requests outside of the Ninth Circuit?

MR. TORRES: May I have a moment, Your Honor? I'm not sure what all the Ninth Circuit encompasses, Your Honor, but I think --

THE COURT: Well, Las Vegas is in there.

MR. TORRES: I understand.

THE COURT: You know, where they -- where somebody just slashed a bunch of people with a knife.

(BRIEF PAUSE FOR ATTORNEY/CLIENT CONFERENCE)

MR. TORRES: No recommendation, Your Honor.

THE COURT: Okay. Mr. Garcia, I'm -- you can go back with the marshals.

Mr. Torres, do you need to speak to him anymore before I call the next case?

MR. TORRES: I'll go visit him out at the jail,

Your Honor.

THE COURT: Okay. Do you want to let him know that you'll go see him?

And, marshals, make sure he gets to see a psychologist or psychiatrist.

(BRIEF PAUSE)

THE COURT: Okay, Mr. Garcia, the -- the marshals will take you to see a doctor.

(10:16:30 A.M., END TIME)

-oOo-

**C E R T I F I C A T E**

U.S. DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )
DEL RIO DIVISION )

I, Vickie-Lee Garza, Certified Shorthand Reporter, do hereby certify that the above-styled proceedings were reported by me, later reduced to typewritten form, and that the foregoing pages are a true and correct transcript of the original notes to the best of my ability.

Certified to by me this 14th day of February, 2023.

/s/ VICKIE-LEE GARZA
TX CSR #9062, Expires 10/31/23
P.O. Box 2276
Del Rio, Texas 78841